IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SERIECE WINBORN,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 5:26-cv-0766<br><br>DISTRICT JUDGE BRIDGET MEEHAN BRENNAN<br><br>MAGISTRATE JUDGE JAMES E. GRIMES JR.<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Seriece Winborn filed a complaint against the Commissioner of Social Security Administration seeking judicial review of the Commissioner's decision denying his application for supplemental security income. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. For the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural background**

In April 2023, Winborn applied for supplemental security income, alleging a disability onset date of May 4, 2021.[1] Tr. 106. In his application, Winborn claimed that he was disabled and limited in his ability to work due to

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

diabetes, neuropathy, asthma, pancreatitis, fibromyalgia, anxiety, high blood pressure, depression, and umbilical hernia. Tr. 96. After the Commissioner denied Winborn's application initially, Tr. 105, 123, and on reconsideration, Tr. 114, 128, Winborn requested a hearing before an administrative law judge (ALJ), Tr. 129.

In April 2025, Winborn, who was represented by a non-attorney representative, appeared and testified at a telephonic hearing before an ALJ. *See* Tr. 37–55. Qualified vocational expert Kevin Yi also testified at the hearing. Tr. 55–62. The following month, the ALJ issued a written decision finding that Winborn was not entitled to benefits. *See* Tr. 15–27. In February 2026, the Appeals Council declined further review, making the ALJ's decision final. Tr. 1; *see* 20 C.F.R. § 404.981.

Winborn timely filed this action in March 2026. Doc. 1. In his brief, Winborn raises the following assignments of error:

> 1. The ALJ's determination is unsupported by substantial evidence because she characterized Plaintiff's treatment history as "conservative" while completely ignoring evidence of invasive facet joint injections and multiple 5-day series of Ketamine infusions.
>
> 2. The ALJ's [residual functional capacity (RFC)][2] determination is not supported by substantial

[2] A residual functional capacity (RFC) is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

> evidence because the ALJ failed to incorporate social interaction limitations from a medical opinion which was found to be mostly persuasive and failed to explain the reason for the absence of such limitations.

Doc. 8, at 1.

**Evidence**[3]

*Personal and Vocational Evidence*

Winborn was born in 1980, making him 42 years of age on the alleged disability onset date. *See, e.g.*, Tr. 381, 383. He attended college for a year, Tr. 356, and worked as a commercial cleaner from 2019 to 2021, Tr. 57, 356, 364. His job duties included "[v]acuuming, dusting, mopping, taking out the trash, cleaning bathrooms and wiping down glass doors." Tr. 42–43. Winborn, however, did not work after his disability began in May 2021. Tr. 43–44.

*Medical Evidence*

Winborn complained of anxiety and low back pain long before his alleged disability onset date. Tr. 628, 651. He had also been diagnosed with chronic pancreatitis, Tr. 433, 434, and received routine treatments for diabetes and diabetic neuropathy, *see* Tr. 444, 672–76. Then, in May 2021, Winborn hurt his back while working. Tr. 43–44.

In November 2023, Winborn presented for a diagnostic mental health assessment. Tr. 959. He reported feeling depressed "most of the day," along

---

[3] The recitation of evidence in this report and recommendation is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs and relevant to their arguments.

with diminished interest and pleasure in most activities, Tr. 959, while experiencing insomnia, nightmares, severe fatigue, worthlessness, excessive guilt, and an inability to think or concentrate, Tr. 959–60, 971. Winborn stated that these mental health symptoms made it "very difficult" for him to work or to interact with others. Tr. 959. Winborn scored 18 on the PHQ-9,[4] which Winborn's mental health provider said was "indicative of moderately severe depression." Tr. 959. After the assessment, the provider diagnosed PTSD, recurrent and severe major depressive disorder with psychotic symptoms, and generalized anxiety disorder. Tr. 970.

The following month, Winborn visited Pavan Tankha, DO, who is a pain recovery specialist at the Cleveland Clinic. Tr. 446. There, Winborn complained of "a sharp pain" in his shoulder blades and "a stabbing and throbbing pain" across his abdomen. Tr. 446. He also reported pain in his leg and foot, which felt "like … carrying a lot of metal." Tr. 446. Winborn rated his pain as seven out of ten on average, adding that the pain required him to recline for five hours per day and limited his sleep to two or three hours per night. Tr. 447. Winborn then underwent a physical evaluation, which confirmed that his pain was "interfering with his daily activities" and

[4] "The PHQ-9 is the depression module of the Patient Health Questionnaire (PHQ), which is a self-administered diagnostic instrument for common mental disorders." *Seals v. Comm'r of Soc. Sec.*, No. 1:18-cv-1345, 2019 WL 4141499, *2 n.2 (N.D. Ohio Aug. 30, 2019) (internal citation and quotation marks omitted). The module scores each of nine criteria on the scale of "0 (not at all) to 3 (nearly every day)." *Id.*

prevented him from socializing or "do[ing] hobbies in the capacity that he likes." Tr. 845.

Winborn also sought mental health services for his depression, anxiety, and PTSD. Tr. 936. In December 2023, when he presented to Kaitlyn Luggelle, PC, for a counseling session, Winborn was calm, oriented, and appropriately dressed, despite appearing "slightly nervous." Tr. 936. During the session, however, Winborn reported stress from his housing situation, explaining that his landlord had sent "threatening messages" regarding unpaid rent and utilities. Tr. 936.

About a week later, Winborn attended a psychiatric evaluation with nurse practitioner Doug Sine, and reported fear, worry, racing thoughts, and loss of sleep. Tr. 973. Winborn also disclosed auditory and visual hallucinations, such as seeing ghosts and hearing his name called, although his thought contents and thought process were generally unremarkable. Tr. 975. Sine prescribed Winborn Seroquel to stabilize his mood and for sleep disturbances. Tr. 978. The following week, Winborn told Luggelle that Seroquel was "helping" him to have a more stable mood and better sleep. Tr. 939.

Winborn continued to attend counseling sessions with Luggelle well into 2024, while facing a series of housing and financial setbacks. Tr. 942–55. In January 2024, Winborn reported that he needed $1,000 to suspend an eviction notice. Tr. 942. The following month, he and his mother had to move into his

brother's home, even though Winborn said that he was "glad to be leaving his current place." Tr. 945. In March and April, Winborn lost several family members within a few weeks of each other, Tr. 948, 952, but he stated that he had "been doing okay" managing grief, Tr. 948. By June 2024, Winborn felt "a little depressed" about staying at his brother's house, but maintained that he was still "doing okay." Tr. 955. In July, however, when he returned to Sine for the first time in six months, Winborn disclosed that he had been completely out of Seroquel since May and had recently visited the emergency room for severe pain, which hospital staff attributed to anxiety. Tr. 986.

Around the same time, in June 2024, Winborn underwent a pain management consultation for his chronic lower back pain, which intensified with prolonged walking and sitting. Tr. 1191. Dr. Dhurv Shah, MD, an interventional pain specialist, observed that Winborn had an antalgic gait, though he was not in acute distress and did not require an assistive device to walk. Tr. 1191. A physical examination revealed tenderness in Winborn's lower lumbar spine and paraspinal region at the facet joint. Tr. 1191. By July, Winborn reported "lower back pain radiat[ing] into [his] glutes," along with "tingling and numbness" in his back. Tr. 1194. Winborn also exhibited limited range of motion in his lumbar region; he could extend his back only eight

degrees with discomfort. Tr. 1195. Lumbar spine X-rays revealed mild degenerative changes at L4/L5 and L5/S1.[5] Tr. 1195.

In August 2024, Winborn received facet joint injections in his lumbar spine. Tr. 1197. Before the procedure, he also discussed a surgical option with Dr. Shah, but declined that option. Tr. 1197. Dr. Shah observed that Winborn tolerated the injections very well and was "medically stable throughout the procedure." Tr. 1197. Thereafter, Winborn reported that tingling and numbness stopped, but some back pain and a limited range of motion remained. *See* Tr. 1199, 1205, 1211. By April 2025, Winborn was taking Gabapentin, Baclofen, and Tramadol for pain control. Tr. 1212. Aside from pain medications, he considered other treatment options, such as heat therapy, routine stretching, and exercise, but declined physical therapy, surgery, or additional injections. Tr. 1212.

Meanwhile, Winborn underwent multiple five-day series of ketamine infusions to treat his neuropathy and pancreatitis. Following his first series in

---

[5] Vertebrae in a person's spine are given letter and number designations according to their location. The neck—the cervical spine—has seven vertebrae designated as C1 through C7. *See* Thomas Scioscia, MD, Vertebrae in the Vertebral Column, Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column [https://perma.cc/R9MM-TBZT]. The twelve vertebrae compromising the upper spine—the thoracic spine—are labeled at T1 through T12. *Id.* The five vertebrae in the lower spine—the lumbar spine—are L1 through L5. *Id.* The five vertebrae at the bottom of the spine—in the sacrum—are labeled as S1 through S5. Thomas Scioscia, MD, Sacrum (Sacral Region), Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/sacrum-sacral-region [https://perma.cc/S2BR-RBTB].

April 2024, Winborn reported a 30 to 40% reduction in pain. Tr. 908–09. During the second series, his blood pressure spiked, prompting clinical staff to briefly stop the infusion. Tr. 894. Yet Winborn remained asymptomatic, reported that he felt "good," Tr. 894, and went on to complete the remainder of the procedure, Tr. 891. Although this second round of infusion initially reduced Winborn's pain by 50%, his pain level rebounded to seven out of ten within a few months. Tr. 1015–16.

A similar pattern occurred during Winborn's subsequent infusions. On the second day of the third series, medical staff again paused the infusion due to elevated blood pressure, Tr. 1008, but Winborn "[t]olerated the infusion well" overall and experienced "no complications" through the conclusion of the procedure, Tr. 1007–09. He experienced decreased pain for months afterward, but the pain had returned by February 2025. Tr. 1077–78. Likewise, when Winborn began his fourth infusion series in March 2025, staff paused the procedure on the first day due to high blood pressure. Tr. 1060. Still, throughout the procedure, the medical staff noted that Winborn "[t]olerated [the] infusion well" and had "no complications." Tr. 1058, 1059.

*Medical Opinion Evidence*

In October 2023, Winborn saw Joshua Magleby, PhD, for a psychological consultative exam. *See* Tr. 433–39. Dr. Magleby observed that Winborn was "clearly alert," oriented, and appropriately dressed. Tr. 435. Winborn also exhibited a "normal and unencumbered gait" with a "normal and upright"

posture, while behaving in a "composed and appropriate" manner. Tr. 435. His social interaction throughout the exam was overall "fairly appropriate" with no clear signs of anxiety, although Dr. Magleby ultimately concluded that PTSD-related anxiety had mildly or moderately impaired Winborn's ability to withstand day-to-day stress and pressure. Tr. 438.

Turning to cognitive limitations, Dr. Magleby determined that while Winborn had "fairly average" comprehension, his ability to follow complex instructions was "somewhat impaired" for his age. Tr. 438. Similarly, although Winborn showed an "adequate" ability to maintain his concentration and retained "more than adequate" ability to perform simple, repetitive tasks, his capacity for multi-step tasks appeared "somewhat impaired for age expectation." Tr. 438. State agency psychologists, both initially and on reconsideration, agreed with Dr. Magleby's opinion. Tr. 102, 112–13. They concluded that Winborn could "tolerate few changes in a routine work setting" and was "limited to performing simple, routine tasks that do not involve arbitration, negotiation, or confrontation and do not involve any piece rate or assembly line work," Tr. 103, 113.

Katrina Sabur, DO, who was Winborn's primary care physician, completed a check-box questionnaire regarding Winborn's physical RFC. Tr. 930. In the questionnaire, Dr. Sabur diagnosed Winborn with chronic pancreatitis and back pain, while listing several physical symptoms, such as abdominal muscle spasm, abdominal swelling, and constant, sharp pain. Tr.

930. Although Dr. Sabur assessed Winborn's overall prognosis as "fair," she acknowledged that Winborn's physical impairments had lasted or were expected to last at least 12 months. Tr. 930. She noted that Winborn could sit, stand, or walk for no more than two hours each and would require 12 to 15 unscheduled breaks per shift, Tr. 931, adding that to prevent ankle and foot swelling, Winborn should elevate his legs above his chest during prolonged sitting, Tr. 932. Dr. Sabur also opined that Winborn could never lift or carry ten pounds or more, could never twist, bend, crouch, or climb ladders, and could climb stairs only "rarely." Tr. 932. Finally, Dr. Sabur determined that Winborn was incapable of even "low stress" work, Tr. 931, and would be off-task for 25% or more of an eight-hour workday, Tr. 933.

State agency physicians, however, reached different conclusions regarding Winborn's physical limitations. *See* Tr. 102–03, 112–13. Both initially and on reconsideration, the physicians diagnosed Winborn with lumbar and cervical degenerative disc disease, diabetes mellitus with neuropathy, and umbilical hernia. Tr. 103, 112. The physicians then determined that Winborn could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds,[6] with no pushing or pulling limitations in

---

[6] "'Frequently' is a term of art in the disability context" and means "activity that is performed … from as little as 1/3 of the time up to (but not exceeding) 2/3 of the workday." *See Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *8 (N.D. Ohio June 11, 2018) (citing the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, Appendix C,* U.S. Dept. of Labor (1993) and Soc. Sec. Ruling 83-10, 1983 WL 31251, at *6 (SSA Jan. 1, 1983)), *report and*

either his upper or lower extremities. Tr. 102, 112. They also found that Winborn could sit, stand, or walk for up to six hours during a workday, Tr. 102, 112, and that he was capable of frequently balancing, kneeling, crouching, and climbing ramps and stairs, as well as occasionally stooping, but was incapable of climbing ladders and crawling, Tr. 103, 112.

*Hearing Testimony*

Winborn, who was represented by a non-attorney representative, appeared and testified at the telephonic administrative hearing in April 2025. Tr. 37–55. At the time, Winborn was unemployed, receiving supplemental nutrition assistance program and Medicaid benefits. Tr. 42. He cited "shortness of breath and the pain of having chronic pancreatitis" as the primary reasons that he could not work, Tr. 44, but later acknowledged that ketamine injections "[a]bsolutely" helped his pancreatic pain management, Tr. 47. Winborn also detailed his other physical impairments, including back pain and abdominal spasms that kept him from prolonged standing or walking, Tr. 44–45, ankle and foot swelling, Tr. 48–49, and ongoing weight and respiratory issues, Tr. 51–53. Winborn explained that per Dr. Sabur's recommendation, he had kept his legs elevated above his chest for an hour every day to reduce swelling. Tr. 49–50. Winborn added that his depression, anxiety, and PTSD

---

*recommendation adopted,* 2018 WL 3126552 (N.D. Ohio June 26, 2018). "Occasionally" means performing an activity for "up to 1/3 of the time." *See Selected Characteristics*, *supra*, and Soc. Sec. Ruling 83-10, 1983 WL 31251, at *5.

continued to affect his ability to work, Tr. 54, noting that he experienced shortness of breath and shaking during anxiety attacks, Tr. 55.

Winborn was not married but had an adult child. Tr. 41–42. Winborn was living with his mother and adult brother. Tr. 41. Winborn testified that on a typical day, he checked the mail, watched TV, and sometimes vacuumed, while his mother prepared meals and his brother shopped for groceries. Tr. 45–46. Each night Winborn had only four to five hours of broken sleep, Tr. 50–51, so he felt very tired the next morning and needed to rest for 30 minutes to an hour twice a day, Tr. 51. Every three months, Winborn underwent ketamine infusions, which took about two and a half hours each time. Tr. 46–47. Following the procedure, he would go home and lie down because he felt "too sedated to do anything else." Tr. 47. Winborn had a driver's license and could drive, Tr. 42, but he rarely socialized with anyone other than his mother and brother, Tr. 46.

Qualified vocational expert, Kevin Yi, also testified. Tr. 55–62. The ALJ asked Yi whether a hypothetical individual with Winborn's age, education, work history, and mental and physical RFC assessed by the state agency consultants could perform any work in the national economy. Tr. 57. Yi answered that while the individual could not perform Winborn's past work, that person still could perform "some of the light unskilled jobs,"[7] such as

---

[7] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b); *see Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir.

producer sorter, housekeeping cleaner, or merchandise marker. Tr. 57–58. When the ALJ reduced the hypothetical individual's exertional level to sedentary,[8] Yi testified that the individual could work as a final assembler, lavatory tester, or electronics inspector. Tr. 59. Next, the ALJ added a requirement that the individual avoid concentrated exposure to dust, odors, fumes, and pulmonary irritants, Tr. 60, and Yi replied that the individual could no longer work as a housekeeping cleaner, but could work as a packaging inspector, along with the other jobs identified earlier. Tr. 60. Yi, however, testified that it would be work-preclusive if the hypothetical individual required additional unscheduled breaks or needed to elevate his legs above chest level. Tr. 61. Yi also observed that an individual who consistently missed one day of work per month and was off-task 15% of the workday would be unable to find competitive employment. Tr. 60–61.

---

2010). Additionally, "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg control." 20 C.F.R. § 404.1567(b).

[8] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a); *see Wages v. Sec'y of Health & Hum. Servs.*, 755 F.2d 495, 498 (6th Cir. 1985).

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since April 17, 2023, the application date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: diabetes mellitus with neuropathy, chronic pancreatitis, chronic pain syndrome, degenerative disc disease of the cervical and lumbar spine, asthma, obesity, depression, anxiety disorder, and posttraumatic stress disorder (PTSD) (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) with occasionally lifting and carrying less than 10 pounds and frequently lifting and carrying less than 10 pounds; sitting for 6 hours in an 8-hour workday; standing/walking for 2 hours in an 8-hour workday; pushing and pulling as much as he can lift and carry; never climbing ladders, ropes, and scaffolds; frequently climbing of ramps and stairs; frequently balancing, kneeling, or crouching; occasionally stooping; never crawling; can understand, remember,

and carry out simple instructions; and can deal with occasional workplace changes.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant … was 42 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education (20 CFR 416.964).

8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since April 17, 2023, the date the application was filed (20 CFR 416.920(g)).

Tr. 18–26.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ must follow a five-step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.
>
> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden

shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir.

2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1. The ALJ Properly Weighed Dr. Sabur's Medical Opinion.*

Winborn first contends that the ALJ violated Social Security Rulings (SSR) 16-3p, 2017 WL 5180304 (SSA Oct. 25, 2017),[9] and 96-8p, 1996 WL 374184 (SSA July 2, 1996),[10] by discrediting Dr. Sabur's medical opinion

---

[9] SSR 16-3p governs the ALJ's evaluation of subjective symptoms, which was formerly referred to as a "credibility" determination in SSR 96-7p. Under SSR 16-3p, an ALJ undertakes a two-step process to assess the limiting effects of a claimant's symptoms. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *2. At step one, "the ALJ will ask whether … there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)); SSR 16-3p, 2017 WL 5180304, at *3. At step two, "if … such an impairment exists," the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities." *Rogers*, 486 F.3d at 247; Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4.

[10] SSR 96-8p requires an ALJ to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *7. In particular, "[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." *Id.*

without sufficient explanation. Doc. 8, at 14; Tr. 24. Specifically, Winborn faults the ALJ for relying on Winborn's "conservative treatment history for his physical health impairments," Tr. 23, without explaining why that history should be regarded as conservative, Doc. 8, at 13–16.

In her written decision, the ALJ initially found that Winborn's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but concluded that Winborn's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." Tr. 24; *see* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *3. The ALJ explained that while Dr. Sabur's opinion "limited [Winborn] to much less than sedentary level work," Tr. 24, thus supporting his disability claim, the opinion was "unpersuasive," "inconsistent with the medical record as a whole," and lacking in "explanation or supporting evidence." Tr. 25.

When assessing the "intensity, persistence, and limiting effects" of a claimant's subjective symptoms, the ALJ must "examine the entire case record, including the objective medical evidence[,] … statements and other information provided by medical sources and other persons[,] and any other relevant evidence." Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4; *see also* 20 C.F.R. § 404.1529. In turn, the ALJ must evaluate the persuasiveness of the medical opinions by considering the following factors: supportability; consistency; treatment relationship; specialization; and other factors. 20

C.F.R. § 404.1520c(c)(1)–(5). Supportability and consistency are the most important factors, 20 C.F.R. § 404.1520c(a), and "[t]o pass muster, the ALJ need only explain 'how [he] considered the supportability and consistency factors for a medical source's medical opinions.'" *Gregory v. Comm'r of Soc. Sec.*, No. 26-5022, 2026 WL 1763752, at *2 (6th Cir. June 18, 2026) (quoting 20 C.F.R. § 404.1520c(b)(2)). ALJs need not explain how they considered the remaining factors. 20 C.F.R. § 404.1520c(b)(2).

As to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[ ] … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) ... is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) ... will be." 20 C.F.R. § 404.1520c(c)(2). Put simply, "'consistency is about how the medical opinion conflicts with evidence in the record, whereas supportability is about how the medical opinion was soundly reached.'" *Baum v. Comm'r of Soc. Sec. Admin.*, No. 1:25-cv-01775, 2026 WL 1753609, at *6 (N.D. Ohio June 18, 2026) (quoting *David C. v. Comm'r of Soc. Sec.*, No. 22-11292, 2023 WL 7345924, at *2 n.1 (E.D. Mich. Nov. 7, 2023)).

Here, Dr. Sabur noted in a check-box questionnaire that Winborn could sit, stand, or walk for less than two hours per day, could rarely lift less than 10 pounds, required 12 to 15 unscheduled breaks per shift, and would likely be

off-task for 25% or more of a workday. Tr. 931–33. As Winborn acknowledges, Dr. Sabur's opinion suggests that Winborn had "extreme, disabling functional limitations." Doc. 8, at 15. After reviewing the medical opinion, however, the ALJ found that "Dr. Sabur provided little explanation or supporting evidence for these extreme limitations." Tr. 25. The ALJ also observed that Dr. Sabur's opinion was "inconsistent with the medical record as a whole, including the claimant's generally benign diagnostic findings, and his mostly conservative treatment history … such as injections and physical therapy sessions." Tr. 25. In sum, the ALJ evaluated the supportability and consistency of Dr. Sabur's opinion and articulated why she found the opinion unpersuasive, citing relevant medical records. *See* 20 C.F.R. § 404.1520c(b)(2) (requiring ALJs to "explain how they considered the supportability and consistency factors for a medical source's medical opinions"); *Malkemus v. Bisignano*, No. 1:25-cv-1863, 2026 WL 1396080, at *8 (N.D. Ohio May 19, 2026) (requiring that "[t]he ALJ's medical source opinion evaluation must contain a 'minimum level of articulation'"). The ALJ did what the regulations require.

Winborn does not challenge the ALJ's finding that "Dr. Sabur provided little explanation or supporting evidence" for her assessment. Tr. 25. Nor does Winborn dispute that Dr. Sabur's opinion was inconsistent with his "generally benign diagnostic findings" in the record. Tr. 25; *see also Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006) ("[W]e limit our consideration to the particular points that [Plaintiff] appears to raise in her

brief on appeal."). Winborn instead maintains that the ALJ erred in finding Dr. Sabur's medical opinion to be "inconsistent with … [Winborn's] mostly conservative treatment history." Doc. 8, at 13–14; Tr. 25. According to Winborn, the ALJ "completely ignor[ed]" the invasive nature of facet joint injections and ketamine infusions, Doc. 8, at 12, by characterizing these procedures as "conservative treatment," Doc. 8, at 13. Winborn also emphasizes that ketamine infusion is "a highly aggressive, invasive, and high-risk therapy reserved only for refractory, severe pain that … failed all standard treatments." Doc. 8, at 14–15.

This argument is unpersuasive. To begin, "courts routinely uphold an ALJ's consideration of the conservative nature of a claimant's treatment as one factor in evaluating a claimant's subjective symptoms." *Amias A. v. Comm'r of Soc. Sec.*, No. 2:25-cv-1031, 2026 WL 2163597, at *5 (S.D. Ohio June 29, 2026) (listing cases), *report and recommendation adopted*, 2026 WL 2161821 (S.D. Ohio July 27, 2026); *see Dolin v. Comm'r of Soc. Sec.*, No. 1:19-cv-2097, 2020 WL 5544357, at *14 (N.D. Ohio Sept. 16, 2020). In turn, a treatment method is deemed "relatively conservative" when "it remains largely the same even as symptoms change or worsen, and no hospitalization or surgical intervention is required." *Dolin*, 2020 WL 5544357, at *14. Accordingly, courts in this Circuit have considered injections as conservative treatment. *See Gatlin-Stanton v. Colvin*, No. 3:15-cv-00717, 2016 WL 3702981, at *43 (M.D. Tenn. July 7, 2016) (quoting *Hauser v. Comm'r of Soc. Sec.*, No. 1:12-cv-796, 2014 WL 48554, at *9

(S.D. Ohio Jan. 7, 2014)); *see also Jirousek v. Comm'r of Soc. Sec.*, No. 1:16-cv-01221, 2017 WL 1969463, at *19 (N.D. Ohio May 12, 2017) (affirming the ALJ's decision where the ALJ considered the claimant's treatment, including facet joint injections, as "relatively conservative"). Other units of this Court have similarly upheld the denial of disability benefits where an ALJ characterized the claimant's infusions as conservative treatment. *See Larcomb v. Comm'r of Soc. Sec. Admin.*, No. 1:22-cv-0175, 2024 WL 1514538, at *10 (N.D. Ohio Apr. 8, 2024); *Polk v. Comm'r of Soc. Sec. Admin.*, No. 1:20-cv-02788, 2022 WL 294840, at *21 (N.D. Ohio Feb. 1, 2022). Consistent with these decisions, ALJs often characterize a claimant's treatment history as *conservative* when it is *non-invasive*. *See Pirtle v. Comm'r Soc. Sec. Admin.*, No. 1:25-cv-660, 2026 WL 607566, at *16 (N.D. Ohio Mar. 4, 2026) (quoting the ALJ); *McDowell v. Comm'r of Soc. Sec. Admin.*, No. 1:20-cv-0297, 2021 WL 1911459, at *6 (N.D. Ohio Apr. 19, 2021) (same), *report and recommendation adopted*, 2021 WL 1909789 (N.D. Ohio May 12, 2021); *Farmer v. Comm'r of Soc. Sec.*, No. 2:19-cv-2000, 2020 WL 1482319, at *5 (S.D. Ohio Mar. 27, 2020) (same); *Artmayer v. Comm'r of Soc. Sec.*, No. 2:16-cv-1070, 2017 WL 3633900, at *5 (S.D. Ohio Aug. 24, 2017) (same), *report and recommendation adopted*, 2017 WL 3995633 (S.D. Ohio Sept. 11, 2017).

Winborn relies on *Dillman v. Comm'r of Soc. Sec.*, 990 F. Supp. 2d 787, 797 (S.D. Ohio 2013), to argue that it is reversible error for an ALJ to "inaccurately characterize[] the claimant's treatment history as conservative

while failing to discuss or analyze aggressive pain management regimens, such as ketamine infusions." Doc. 8, at 15. *Dillman*, however, is distinguishable. In that case, the ALJ ignored the claimant's shoulder surgery when determining that the claimant "ha[d] received only conservative treatment." 990 F. Supp. 2d at 797. Here, by contrast, there is no evidence that Winborn underwent a treatment procedure requiring hospitalization or surgical intervention. *See Dolin*, 2020 WL 5544357, at *14. Rather, the record shows that while Winborn discussed various treatment options with Dr. Shah before undergoing facet joint injections in August 2024, Winborn declined surgical intervention. Tr. 1197. Shortly before the administrative hearing in April 2025, Winborn again refused surgery for his back pain, opting instead for a prescribed medication regimen—consisting of Gabapentin, Baclofen, and Tramadol—along with heat therapy, routine stretching, and exercise. Tr. 1212. He also declined physical therapy and additional injections, whereas the claimant in *Dillman* continued to "tr[y] many types of treatment," including "physical therapy and injections." 990 F. Supp. 2d at 797. Furthermore, regarding his ketamine infusions, Winborn testified that the procedure took only about two and a half hours each day, after which he would return home and rest. Tr. 46–47. Because Winborn's medical regimen relied on prescribed medication and outpatient procedures, the ALJ did not err in characterizing the treatment history as "mostly conservative." Tr. 25.

In arguing otherwise, Winborn emphasizes that medical staff had to pause his ketamine infusions multiple times due to elevated blood pressure. *See* Doc. 8, at 15. While this is true, the record also indicates that after each time that Winborn's blood pressure spiked, the staff successfully proceeded with, and completed, the infusion series. *See* Tr. 1007–09 (third series); Tr. 1077–78 (fourth series). Indeed, when staff paused the procedure during his second infusion series due to high blood pressure, Winborn remained "asymptomatic" and reported feeling "good." Tr. 894. Moreover, despite these sporadic instances of elevated blood pressure, medical staff repeatedly noted that Winborn "[t]olerated [the] infusion well," without complications throughout the infusion series. *See, e.g.*, Tr. 1007, 1058, 1059. While Winborn claims that his elevated blood pressure threatened "stroke or cardiovascular collapse," Doc. 8, at 15, the record contains no mention of these risks.

Finally, Winborn claims that the ALJ improperly "cherry-picked" evidence by "not discuss[ing] the frequency, invasive nature, side effects, and overall impact" of the facet joint injections and ketamine infusions that Winborn underwent. Doc. 8, at 15–16. As courts have recognized, this type of argument is "seldom successful." *Delong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014); *Phillips v. Berryhill*, No. 3:16-cv-0193, 2017 WL 6045451, *at 5 (W.D. Ky. Dec. 6, 2017); *Smith v. Comm'r of Soc. Sec.* No. 1:14-cv-0984, 2015 WL 7460080, at *3 (W.D. Mich. Nov. 24, 2015). An ALJ improperly "cherry-picks" evidence when the ALJ simply ignores a conflict between a

medical opinion and the ALJ's RFC finding, while failing to explain why she chose to credit one item of evidence over another. *Howell v. Comm'r of Soc. Sec.*, No. 3:25-cv-1206, 2026 WL 1109373, at *17 (N.D. Ohio April 24, 2026), *report and recommendation adopted*, 2026 WL 1615242 (N.D. Ohio June 5, 2026). But "[i]t is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered." *Thomas v. Bisignano*, No. 1:23-cv-00612, 2026 WL 376857, at *7 (N.D. Ohio Feb. 11, 2026), *report and recommendation adopted*, 2026 WL 775557 (N.D. Ohio Mar. 19, 2026); *see also Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) (explaining that an ALJ need not discuss every piece of evidence in the record). This is because "a duty to 'consider' the evidence is different than a duty to 'discuss' the evidence." *Swain v. Comm'r of Soc. Sec. Admin.*, Case No. 1:24-cv-02224, 2025 WL 2322785, at *7 (N.D. Ohio Aug. 12, 2025). Accordingly, as the Sixth Circuit has explained, "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006).

In any event, the ALJ here did not "ignor[e] evidence that points to a disability finding," *Smith v. Comm'r of Soc. Sec.*, No. 1:11-cv-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013), or "significantly mischaracterize[]" the medical record, *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016). To the contrary, the ALJ expressly recognized the conflict between the RFC findings and Dr. Sabur's opinion,

which suggested "extreme limitations," but resolved this conflict on the basis that Dr. Sabur's opinion was "inconsistent with the medical record as a whole, including the claimant's generally benign diagnostic findings, and his mostly conservative treatment history." Tr. 25. As discussed above, there was substantial evidence to support this conclusion. So the ALJ's decision does not warrant reversal. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) ("The decision of an ALJ is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ."). Winborn's first assignment of error lacks merit.

*2. The ALJ Did Not Err in Formulating the Mental RFC.*

In his second assignment of error, Winborn contends that the ALJ erred in formulating the mental RFC by "fail[ing]," without sufficient explanation, "to incorporate social interaction limitations" from Dr. Magleby's opinion. Doc. 8, at 16. In his opinion, Dr. Magleby noted that while Winborn maintained "good" relationships with his co-workers and supervisors, there remained "some impairment" in Winborn's "ability to relate to others … due to trauma-related anxiety." Tr. 438. She also observed that Winborn "appear[ed] to be mildly to moderately impaired" in terms of his "ability to withstand the mental stress and pressures associated with day-to-day work activity." Tr. 438. The ALJ reviewed Dr. Magleby's opinion and found it "mostly persuasive," Tr. 24, while determining that Winborn had "a mild limitation" in interacting with

others and "a moderate limitation" in adapting or managing himself, Tr. 20; *see also* 20 C.F.R. § 404, Subpart P, Appendix 1, 12.00(E)(4). Ultimately, the ALJ's RFC restricted Winborn to "understand[ing], remember[ing], and carry[ing] out simple instructions," and to "deal[ing] with occasional work changes," but contained no specific restrictions regarding social interaction or stress tolerance. Tr. 21.

Relying on *Kinney v. Comm'r of Soc. Sec.*, No. 23-3889, 2024 WL 2273365 (6th Cir. May 20, 2024), Winborn argues that the ALJ committed reversible error because she failed to "explain why certain limitations from a persuasive medical opinion [were] not included in the RFC." Doc. 8, at 17; *see also* Doc. 10, at 4–5. Winborn, however, overlooks "a distinction between an opinion that is fully persuasive and one that is mostly persuasive." *Kelly B. v. Comm'r of Soc. Sec.*, No. 3:25-cv-74, 2026 WL 482391, at *5 (S.D. Ohio Feb. 20, 2026), *report and recommendation adopted*, 2026 WL 701933 (S.D. Ohio Mar. 12, 2026). In *Kinney*, the ALJ found a medical opinion to be "consistent with and supported by the record as a whole" and "persuasive," but then omitted without explanation a limitation contained in the opinion that required flexible breaks. 2024 WL 2273365, at *5. In reversing the ALJ's decision, the Sixth Circuit determined that "although the ALJ was not required to incorporate the flexible break scheduling limitation, the failure to do so without explaining its omission warrant[ed] reversal" because the ALJ found the opinion persuasive. *Id.* at *9. The ALJ here, however, only found Dr. Magleby's opinion "mostly"—

rather than fully—persuasive. Tr. 24. As a result, *Kinney* is inapposite, *see, e.g.*, *Murray v. Bisignano*, No. 5:24-cv-639, 2025 WL 2249590, at *11 (N.D. Ohio Aug. 7, 2025) (distinguishing *Kinney* because an ALJ found medical opinions to be only "generally persuasive"); *Haahr v. Comm'r of Soc. Sec.*, No. 3:23-cv-2159, 2024 WL 5242214, at *4 (N.D. Ohio Dec. 30, 2024) (distinguishing *Kinney* because "the ALJ did not state he found the medical opinion persuasive, but only assigned it 'some weight'").

In any event, even assuming that *Kinney* controls, the ALJ here sufficiently explained why she incorporated only certain limitations from Dr. Magleby's opinion into her ultimate RFC finding. First, regarding Winborn's ability to interact with others, the ALJ found that Winborn had only "a mild limitation." Tr. 20. In making this finding, the ALJ cited Dr. Magleby's observations that Winborn had "good" relationships with past co-workers and supervisors, and that "his social relating during the evaluation was fairly appropriate without obvious sings of anxiety." Tr. 20 (citing Tr. 438). Where, as here, an ALJ "rate[s] the degrees of … limitation as 'none' or 'mild,'" then the ALJ "will generally conclude that [the] impairment[] is not severe." 20 C.F.R. § 404.1520a(d)(1). As a result, a "[c]laimant's mild limitations do not automatically mandate specific limitations in the RFC." *Phillips v. Comm'r of Soc. Sec. Admin.*, No. 3:22-cv-1144, 2023 WL 4078204, at *6 (N.D. Ohio Apr. 4, 2023), *report and recommendation adopted*, 2023 WL 5602726 (N.D. Ohio Aug. 30, 2023); *see also Plotkowski v. Comm'r of Soc. Sec.*, No. 2:20-cv-12011, 2022

WL 413371, at *7 (E.D. Mich. Jan. 18, 2022) (listing cases), *report and recommendation*, 2022 WL 407079 (E.D. Mich. Feb. 9, 2022).

Next, Winborn argues that "[t]he ALJ here ignore[d] [Winborn's] mild to moderate limitations" in tolerating stress and work-related pressure. Doc. 8, at 18; *see* Tr. 438. Winborn also claims that this omission "deprived the [C]ourt of a 'logical bridge between the evidence … and [the ALJ's] conclusion,'"[11] Doc. 8, at 19 (quoting *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011)). But, when fashioning an RFC, an ALJ only needs to adopt those limitations that she accepts as credible. *See Casey v. Sec'y of Health & Hum. Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). "Nor is the ALJ required to adopt [a] state agency psychologist's limitations wholesale," regardless of how much weight the ALJ gives to the psychologist's opinion. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x. 267, 275 (6th Cir. 2015). If an ALJ omits a limitation from the RFC, "whether the omission is error depends on the nature of that limitation."

---

11 Like many Social Security plaintiffs, Winborn repeatedly claims that the ALJ failed to "build an accurate and logical bridge" between his analysis and conclusion. *See, e.g.*, Doc. 8, at 12, 14. This reference to a logical bridge apparently first appeared in this Circuit in *Allshouse v. Comm'r of Social Security*, No. 07-12516, 2008 WL 4372646, at *9 (E.D. Mich. Sept. 19, 2008), which relied on Seventh Circuit precedent. But the idea that an adjudicator's logic should be discernible is not a special feature of Social Security cases. In fact, the line of Seventh Circuit precedent from which the phrase emerged began outside the Social Security context as metaphor to make the generally applicable point that a court "cannot defer to something that is not based on facts—logical facts—in the record." *J.C. Penney Co. v. NLRB*, 123 F.3d 988, 996 (7th Cir. 1997) ("[W]e can only defer to the ALJ's findings when the reasons for his decision build an accurate and logical bridge between the evidence and the result. Here, the bridge is out."). So the idea behind the metaphor is not a doctrine, but a truism.

*Kreilach v. Comm'r of Soc. Sec.*, 621 F. Supp. 3d 836, 846 (N.D. Ohio 2022). "[T]he pertinent question in examining a potential limitation is whether the medical evidence compels a specific, concrete restriction on [Winborn's] ability such that the ALJ was required to include it in the [RFC] or explain its omission." *Id.*

Here, aside from observing that Winborn's "ability to withstand the mental stress and pressures associated with day-to-day work activity appears to be mildly to moderately impaired," Tr. 438, Dr. Magleby offered no concrete functional limitation that could be accounted for in an RFC, *see Overstreet v. Saul*, No. 1:20-cv-00645, 2021 WL 5017754, at *15 (N.D. Ohio May 17, 2021) ("The pertinent question in examining a potential RFC limitation is whether the medical evidence compels a specific, concrete restriction on the claimant's abilities."), *report and recommendation adopted*, 2021 WL 4145167 (N.D. Ohio Sept. 13, 2021). In turn, his opinion that Winborn "appear[ed] to be mildly to moderately impaired," Tr. 438, was a "broad, general statement" without a clear vocational meaning, *Walker v. Saul*, No. 1:20-cv-0504, 2021 WL 8342880, at *8 (N.D. Ohio Apr. 2, 2021) (finding a physician's statement that a claimant "need[ed] flexible break times" was broad and general), *report and recommendation adopted*, 2022 WL 1134300 (N.D. Ohio Apr. 18, 2022). Dr. Magleby never clarified what he meant by his vague statement. *See Williamson v. Comm'r of Soc. Sec.*, No. 1:17-cv-00276, 2019 WL 189822, at *5 (E.D. Tenn. Jan. 14, 2019) (finding a medical opinion to be vague, where it

noted that the claimant's memory was "mildly impaired" but did not define the term). And Winborn never elicited vocational expert testimony regarding the significance of Dr. Magleby's opinion. *See* Tr. 60–62; *Walker*, 2021 WL 8342880, at *8 (determining that a broad and vague medical opinion offered no concrete functional limitation where the claimant failed to ask the vocational expert about the vocational significance of the opinion).

The ALJ properly considered and articulated this lack of concrete functional limitation when evaluating the persuasiveness of Dr. Magleby's medical opinion under 20 C.F.R. § 404.1520c(b)(2). Regarding consistency, the ALJ found that Dr. Magleby's opinion was "mostly consistent with .... [Winborn's] medical records and treatment history, without evidence of psychiatric hospitalization or other serious issues in the record." Tr. 24. Turning to supportability, however, while the ALJ highlighted that Dr. Magleby was "a mental health specialist," whose opinion was detailed "with references to [Winborn's] mental status examination findings and other objective evidence," she also found the opinion to be "somewhat vague and not fully stated in vocational terms." Tr. 24. This finding of vagueness makes Dr. Magleby's opinion less supported and, by extension, less persuasive. *See Woodard v. Comm'r of Soc. Sec. Admin.*, No. 5:22-cv-1728, 2023 WL 6005004, at *10 (N.D. Ohio July 27, 2023), *report and recommendation adopted*, 2023 WL 5842016 (N.D. Ohio Sept. 11, 2023); *see also Martin v. Comm'r of Soc. Sec.*, No. 1:25-cv-17, 2026 WL 738089, at *3 (E.D. Tenn. Mar. 16, 2026) ("'[V]ague'

medical opinions that 'do[ ] not actually describe the functional limitations ... do not help an ALJ assess whether an individual is 'disabled.'") (quoting *Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 434 (6th Cir. 2018)).

Finally, even if the ALJ needed to adopt Winborn's stress tolerance limitation, her RFC adequately accounted for it. Again, Dr. Magleby did not provide any concrete limitations regarding the type of work-related stress or pressure with which Winborn had difficulty tolerating. Instead, Dr. Magleby's broad conclusion that Winborn was mildly or moderately limited in his "ability to withstand the mental stress and pressures," Tr. 438, is mirrored by the ALJ's RFC restricting Winborn to performing only "simple" tasks. *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 (6th Cir. 2014) (holding that a physician's opinion that a claimant is moderately limited in her ability "to respond to changes at work" is reflected an RFC restricting the claimant to "routine" and "repetitive" tasks); *see also Querin v. Comm'r of Soc. Sec.*, No. 3:20-cv-1760, 2023 WL 6348209, at *3 (N.D. Ohio Sept. 29, 2023) (holding that an RFC restricting a claimant to "tolerating few changes in the work setting" adequately addressed her limitation concerning stress management). The restriction to simple tasks with only "occasional" worksite changes provides "structure and monotony," which minimizes Winborn's exposure to workplace stress. *Smith-Johnson*, 579 F. App'x at 437.

In sum, the ALJ properly conducted the requisite analysis as to the persuasiveness of Dr. Magleby's opinion and sufficiently articulated her

reasoning. *See* 20 C.F.R. § 404.1520c(b). Because Winborn has not shown that the ALJ erred in formulating Winborn's RFC, there is no basis for remand.

**Conclusion**

For all the reasons stated, I recommend that the District Court affirm the Commissioner's decision.

Dated: October 21, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).